# Richmond.

INGERSOLL v. POND AND OTHERS.

March 12, 1908.

1. GIFTS—*Insurance Policy—Delivery—Assignment.*—In order to constitute a valid gift of an insurance ·policy there must be either a delivery, actual or constructive, of the policy by the donor to the donee, or a formal written assignment of the policy delivered to the donee by the donor. The mere delivery by the donor to the donee of the pass book in which are entered the receipts for assessments made on a benefit certificate while the certificate or policy is retained by the donor is not sufficient to constitute a valid gift of the certificate or policy.

2. SPECIFIC PERFORMANCE—*Essentials.*—All applications to courts of equity to compel specific performance of contracts are addressed to the sound judicial discretion of the court, regulated by established principles. In order to warrant a decree for specific performance the contract must not only be distinctly proved, but it must be clearly and distinctly ascertained. It must be reasonable, certain, legal, mutual, upon valuable or at least meritorious consideration, and the party seeking performance must not have been backward, but ready, desirous, prompt and eager.

3. GIFTS—*Specific Performance—Suit by Legatee to Enforce Gift by Testator—Case in Judgment.*—A suit by one of three legatees against the other two claiming the sole ownership of a policy of insurance on the life of the testator, by virtue of an alleged gift made by the testator in his lifetime but which policy he had bequeathed to the three jointly, is in the nature of a suit for specific performance of a contract, and is controlled by the rules of equity applicable to such suits. In the case in judgment the evidence to support the alleged gift is not of that clear and satisfactory nature that would warrant a decree for specific performance.

Appeal from a decree of the Chancery Court of the city of Richmond. Decree for defendants. Complainant appeals.

*Affirmed.*

The opinion states the case.

*Smith, Moncure & Gordon,* for the appellant.

*Meredith & Cocke, Sol Cutchins* and *L. O. Wendenburg,* for the appellees.

CARDWELL, J., delivered the opinion of the court.

In the year 1887, John L. Ingersoll, Sr., father of appellant, John L. Ingersoll, Jr., and of appellees, Ida C. Pond and Ella O. Krengel, became a member of the Royal Society of Good Fellows (chartered under the laws of the State of Rhode Island) and had issued to him a benefit certificate or policy of insurance of $3,000, payable upon death of the insured to his wife.

The by-laws of the society provided, that in the event of the death of the beneficiary, without any new designation, as provided in the by-laws, the benefit should go to the next of kin of the insured within the second degree of consanguinity, as defined by the laws of the State of Rhode Island.

The wife of the insured died July 3, 1901, and the beneficiary was not changed in the manner prescribed by the by-laws of the society. The assessments upon the certificate holders were payable on or before the last day of each month, and unless they were paid when due the insured forfeited his membership in the society, and his certificate had no surrender or other value.

The assessment having increased from time to time before Mrs. Ingersoll's death, and the insured receiving notice of another increase to take effect July 1, 1901, he determined to pay no more of the assessments, and thereafter, beginning with the July assessment of 1901, and until the death of the insured, on March 9, 1902, they were paid by appellant, as well as all monthly dues to the local assembly, of which insured was a

member, such sick benefits as were payable under the rules of
the order during that period being received by the insured, the
aggregate amount of assessments and dues paid by appellant
being $111.98. To enable appellant to make payment of these
assessments and have the same receipted for, insured delivered
to him a book called a "pass book," used by the society, in
which receipts for assessments were made; but the certificate
or policy of insurance was retained in the possession of the in-
sured until his death.

The insured, John L. Ingersoll, Sr., left surviving him his
three children above named, and two grandchildren, children of
a deceased son, both of whom are infants; and in the will of
said Ingersoll, Sr., made and published on the 2nd day of Feb-
ruary, 1902, prior to his death, among other clauses disposing
of his real and personal estate, the following appears: "I give
and bequeath unto my children, Ella O. Krengel, Ida C. Pond
and John Ingersoll, my life insurance in the Royal Society of
Good Fellows, provided, however, that my son John L. Inger-
soll be first paid back all dues and premiums paid by him on
said policy since June 30, 1901."

The Supreme Assembly of the Royal Society of Good Fel-
lows, in payment of the amount of said benefit certificate, sent
to the officers of the local assembly in Richmond, a draft on its
supreme treasurer for $3,000, payable to J. L. Ingersoll, Ida
C. Pond and Ella O. Krengel, being ignorant of the existence
of grandchildren of the deceased member, whose parent was
dead; but J. L. Ingersoll (appellant), refusing to accept one-
third of the amount and the dues and assessments paid by him,
with interest thereon, and release the society, it was agreed that
the $3,000 should be deposited in bank to the joint credit of
the three children of the insured, without prejudice, to await
the termination of a suit to have adjudicated the rights of the
parties in interest with respect to the fund. Whereupon, the
bill in this cause was filed by appellant, which was answered by
Mrs. Pond and Mrs. Krengel, and subsequently the infant

children of the deceased son of the senior Ingersoll, suing by their mother and next friend, filed their petition in the suit, claiming one-fourth of the benefit of the certificate of insurance, under the by-laws of the society.

Upon the hearing of the cause on the pleadings, depositions of witnesses, and the documentary evidence filed in the record, the decree here complained of was entered, adjudicating that appellant had "failed to establish the contract alleged in his bill to have been entered into between himself and the late John L. Ingersoll;" "that the proceeds of the benefit certificate, in the bill and proceedings mentioned, should pass in accordance with the by-laws of the supreme assembly, Royal Society of Good Fellows, to the next of kin of the said John L. Ingersoll, deceased, within the second degree of consanguinity, as defined by the statutes of the State of Rhode Island;" and that "the proceeds be paid to the following persons and in the following proportions, to-wit: To the complainant (appellant here) John L. Ingersoll, and the defendants Ida C. Pond and Ella O. Krengel, children of the said John L. Ingersoll, deceased, one-fourth each, and to said John Ingersoll and Edith Ingersoll, children of Charles E. Ingersoll, a deceased son of the said John L. Ingersoll, deceased, one-eighth each—subject, however, to the claim of complainant for such sums of money as he has advanced to keep the said certificate in force, with interest thereon from the respective dates of such advances."

Appellant in his bill claims the whole fund arising from the benefit certificate or policy of insurance, both as a gift and by virtue of a contract of assignment entered into between the insured and himself, though he admits that the policy was never transferred to him by his father, even by delivery, and does not allege any written assignment of it. He does, however, allege the delivery to himself by his father of the receipt or pass book, upon which the premiums or assessments paid to the society were entered when received by the collecting officer, which receipt or pass book, as appears from the evidence, it was

necessary for appellant to have when making payment of an assessment on the policy. It is upon the delivery of this receipt or pass book to him, and the depositions of several witnesses to prove various declarations of the insured with regard to the alleged gift or assignment of the policy, that appellant has to rely as supporting his claim to the entire fund realized from the policy.

In the bill appear these allegations: On February 2, 1902, appellant's father executed said will, in which "he attempted to revoke the *gift* of said certificate to your orator;" that appellant's father had *given* said certificate to him and he "claimed it as his own by virtue of said *gift* and said agreement." And, in the agreement signed by appellant and appellees, Mrs. Pond and Mrs. Krengel, above referred to, entered into November 26, 1902, and under which the money was deposited in bank, his claim to the policy is thus stated: "And whereas, the said J. L. Ingersoll (plaintiff) claims the sole benefit of said insurance by virtue of an alleged gift to him by the said John L. Ingersoll (insured) in his lifetime, and proposes to institute suit in the ———— Court of the city of Richmond for the purpose of having his rights in said policy adjudicated."

It appears, therefore, that although he also alleges a contract of assignment with his father, appellant rested his claim to the policy of insurance mainly upon a gift of it to him from his father, and with respect to this claim it would seem too clear to admit of argument that it falls under the weight of appellant's own admissions, to which we have adverted. All that he has alleged as to the consummation of such a gift is, that "your orator's father delivered to your orator the book in which receipts for assessments were made." He does not attempt to prove any formal written assignment by his father to him, as donee, or any formal written notice to the society, or any of its home or local officers, of such alleged gift. Conceding that Ingersoll, Sr., delivered his receipt or pass book to the appellant, intending that he keep it, as to which the evidence is con-

flicting, that fact would not be sufficient to consummate a gift of the policy, since the pass book is nothing more than the evidence of the payment of past assessments, and does not represent the policy any more than a receipt for a premium on an ordinary life policy.

It is a settled proposition of law, by the decision of this court in *Spooner* v. *Hilbish,* 92 Va. 333, 23 S. E. 751, and the authorities there reviewed or cited, that in order to consummate a *gift* of an insurance policy, there must be either a delivery of the policy by the donor to the donee, or there must be a formal written assignment of the policy delivered to the donee by the donor. The case just named was as follows: H, insured, took out a policy on his life and paid the premiums thereon. About 16 months before H's death, he contemplated making a voluntary assignment of the policy to his friend, S. As the rules of the insurance company required an assignment of a policy to be made in writing in duplicate, and sent to the company for acknowledgment (the company retaining one assignment and the other being retained by the insured), H made the assignment to S in the manner prescribed, but retained in his own possession both the policy and his duplicate assignment, the company holding the other assignment. After H's death suit was instituted by H's executor against S *et als,* to set aside the alleged assignment. The opinion by Riely, J., says: "A gift is a contract without a consideration, and, to be valid, must be executed. A valid gift is, therefore, a contract executed. It is to be executed by the actual delivery by the donor to the donee, or to some one for him, of the thing given, or by the delivery of the means of obtaining the subject of the gift, without further act of the donor to enable the donee to reduce it to his own possession. The intention to give must be accompanied by a delivery, and the delivery must be made with an intention to give; otherwise, there is only an intention or promise to give, which, being gratuitous, would be a mere nullity. Delivery of possession of the thing given, or the means of obtaining

it, so as to make the disposal of it irrevocable, is indispensable to a valid gift. 3 Minor's Inst. Pt. 1, 89-93, and 3 Pomeroy's Eq. J. 1149." Further says the opinion: "Without the delivery of the policy, or of a writing assigning it, the gift was incomplete and invalid, a mere nullity, and consequently incapable of being enforced, either at law or in equity." *Leftwich* v. *Wells,* 101 Va. 255, 42 S. E. 364, 99 Am. St. Rep. 865.

The remaining question in this case is, whether or not it has been proved that the certificate or policy of insurance in question was assigned, or agreed to be assigned, to appellant by a contract between the insured and appellant.

The specific averment of the bill is, that appellant's father entered into a contract with him, by which he (appellant) was to pay all future assessments and dues, and to receive the death benefit stipulated for in the policy, while the father was to receive any sick benefits. It is claimed that this contract was entered into on or about June 30, 1901, and there is not one word of direct evidence of that fact; but, as already mentioned, declarations of the assured thereafter, testified to by several witnesses, are alone relied on for proof of it.

Since the suit against the insured's other legatees under his will, or against his next of kin, other than appellant, under the by-laws of the society, is to enforce the alleged contract, the rules of equity jurisprudence unquestionably control in the determination of the right of appellant to have specific performance of the contract. The doctrine that a court of equity will consider as done that which ought to have been done, has no sort of application to this case, since a court of equity could not hold what a party to an alleged contract ought to have done unless the contract has been clearly proved as alleged.

The rule of evidence in suits of this character has been firmly established by the decisions of this court. The latest statement of the rule, to be found in *Clinchfield Coal Co.* v. *Powers,* 107 Va. 393, 59 S. E. 370, 1 Va. Appeals 540, is as follows: "All

applications to the court to compel specific performance are addressed to the discretion of the court—a sound judicial discretion, regulated by the established principles of the court—and the contract must not only be distinctly proved, but it must be clearly and distinctly ascertained; it must be reasonable, certain, legal, mutual; upon valuable, or at least meritorious, consideration; and the party seeking specific performance must not have been backward, but ready, desirous, prompt and eager."

In *Railroad Co.* v. *Lewis,* 76 Va. 833, it is said: "But the agreement sought to be enforced must not only be clearly proved; it must be certain and definite in all its parts. Its terms must be so precise as to obviate any reasonable misunderstanding of their import; and if they be vague and uncertain, or the evidence to establish the contract be insufficient, a court of equity will decline to interfere to enforce it."

The rule is also clearly stated in *Rockercharlie* v. *Rockercharlie,* 2 Va. Dec. 582, where it is declared, that the rule "is settled by a long course of decisions." See also *Darling* v. *Cummins,* 92 Va. 521, 23 S. E. 880.

In *Blanchard* v. *Railroad Co.,* 31 Mich. 443, 18 Am. Rep. 142, cited with approval in *Clinchfield Coal Co.* v. *Powers, supra,* the opinion says: "Where the court is unable from all the circumstances of the case to say whether the minds of the parties met upon all the essential particulars, or if they did, then cannot say upon what substantial terms they agreed, or trace out any practical line where their minds met, specific performance will be refused."

As to what would and would not be regarded a valid assignment of an insurance policy, see *Coffman* v. *Liggett's Admr.,* 107 Va. 418, 59 S. E. 392, 1 Va. Appeals 604.

Coming then to an examination of the proof relied on by appellant in this case, we find it, when viewed in the most favorable light for appellant, as follows: The first witness for appellant, a friend of insured, states that insured said to wit-

ness about four or five weeks before he died, that "His wife had had him insured in some company (I don't know what the company was named) for her benefit, and since her death he didn't propose to carry the policy any longer; and that he had turned it over to J. L. Ingersoll, his son. That was all the conversation I had with him."

Another witness, the secretary of the local assembly of the society of which insured was a member, testifies that insured came to the house of witness after the death of insured's wife and paid dues on his policy, and told witness that he did not intend to pay any more dues. Witness advised him to continue, when insured replied: "No, I won't pay another cent on it. My wife has gone, and I don't expect to get any benefit from it. I am going to see if I can get my children to take it up. This is the last payment I am going to pay;" that insured further said: "If they (the children) would carry it on, they could divide it among themselves; and if they would not carry it on, he would give it to any one who could carry it on." Same witness saw insured four or five times and discussed the policy with him, and advised insured to designate a new beneficiary, but "every time he (insured) told me there was plenty of time. That he was going to make it over to Mr. Ingersoll, Jr., but he said there was plenty of time." When appellant paid to this same witness the first assessment he paid on the policy (No. 248), witness told appellant that "unless the policy was changed, the money would go to his father's heirs at law." In several interviews between witness and insured, after Mrs. Ingersoll's death, witness impressed on insured that the policy must be changed if he (insured) wanted appellant to get the money, and that all of insured's children would get the money if change was not made; but insured would always reply: "There was plenty of time."

Another witness, the presiding officer of the local assembly of which insured was a member, says, that he saw insured about two weeks after Mrs. Ingersoll's death, when insured

told witness that his daughter had refused to take the policy, and that "he would make it over" to appellant; not that insured had turned the policy over to appellant, but "would do it."

Another witness, a Mrs. Hundley, a friend of insured, says, that about two weeks after Mrs. Ingersoll's death, she saw insured twice, and he said he had offered the policy to his two daughters, but they did not want it; that he "would give" policy to the child who "would keep it up." The husband of this witness testifies substantially as she did, and adds, that in the last conversation with insured, the latter mentioned the policy, "and then he had turned it over to Louis" (appellant) —not that insured said he had turned it over.

Witness, Browing, says that while working on a house for insured he and witness were standing on the street at a point named, near the said house, appellant came up and asked insured about his policy; to which insured replied, "Go and pay it and he would make it over to him as soon as he could." Q. "Did young Mr. Ingersoll approach his father and ask him about the policy" A. "Yes, sir." Q. "And the old gentleman told him to pay the assessments and he would have the policy?" A. "Yes, sir, and he started across the street, and Mr. Ingersoll said, 'Be sure and pay them.'" Q. "You mean the old gentleman told the young man to be sure and pay the assessments on the policy?" A. "Yes, sir." Q. "You also remember that the old gentleman told young Mr. Ingersoll that he would have the policy transferred to him?" A. "Yes, sir, he did."

W. C. Hunt, a nephew of insured, testified that a few days after Mrs. Ingersoll's death witness heard insured say that dues on policy were too heavy, "and that he would give it up, and any of the children could have it that kept it up."

The remaining witness for appellant, of whom mention need be made, is a Mrs. Crogan, formerly widow of insured's deceased son, and her statement is, that after insured's death, she

heard appellees, Mrs. Pond and Mrs. Krengel, say that insured had suggested that his three children keep up the policy, and they had declined, except appellant, who had kept it up; but witness does not say that Mrs. Pond or Mrs. Krengel stated when said offer was made by insured, or the terms upon which appellant had kept up the policy.

The foregoing is the material evidence offered by appellant in chief, and in rebuttal five witnesses were examined, four of whom had been examined in chief, and their re-examination developed no new facts as to the merits of the case. The fifth was Mrs. Krengel, who was required under an order of the court to testify, and the sum and substance of what she says with respect to the policy is, that she heard her father mention the policy only once after Mrs. Ingersoll's death, when he said, "They that kept it (policy) up, would be paid back what they had been paying, and then be equally divided."

Leaving wholly out of view the inconsistency appearing in the declarations of the insured touching the policy of insurance, as testified to for appellant, and also the evidence of appellees' witnesses conflicting therewith, bringing out still more clearly the inconsistency in the declarations said to have been made by the insured, the most that can be said of appellant's evidence is, that it tends to prove an intention on the part of insured "to give" or "make over" the policy to appellant; but, as we have said, the intended gift was never consummated, and is, therefore, a nullity. None of the witnesses state any facts from which it could be determined the substantial terms upon which it was agreed between the parties that the policy would be made over to appellant, or "trace out any practical line where their minds met." One of appellant's witnesses, it will be observed, says insured told him he "had turned it (policy) over" to appellant, though witness did not know what company the policy was in. Another that in the last conversation had with insured about the policy, he "then had turned it over" to appellant, yet from the statements of the other witnesses and

the admissions of appellant the policy was never turned over to him. If it could be conceded that the proof shows that the insured declared that he "would give," or "would turn over," or even "had turned over" the policy to appellant, the terms upon which insured was to part, or had parted, with the policy, in order that appellant might receive the benefit of it upon the death of the insured, are not sufficiently proved, and where there is such conflict of evidence as in this case, as to the true contract between father and son, the declaration of the father in his will as to what the contract was is very persuasive, to say the least of it.

If the contract was as appellant contends, in addition to the lack of the clear proof that the law requires, no reason suggests itself to the mind when considering it, why the receipt or pass book only was turned over to appellant. Why should not the policy have been also delivered with the designation of appellant as the new beneficiary endorsed thereon? Why should the father have withheld the policy from his son, if he had agreed "to give" or "make it over" to him, when he, as well as the son, had more than once been warned that unless the policy was delivered to the son, and he named as the new beneficiary, the benefit of the policy would be shared by all of the insured's children? The answer to these inquiries is not to be found in the evidence appearing in the record, and it is inconceivable that appellant, if he was purchasing the entire benefit of the policy, would have neglected to have the policy delivered to him and his name endorsed thereon as the beneficiary, as he was by friends admonished to do. The version of the father of the arrangement with appellant touching the policy, as indicated in his will, was doubtless disappointing to appellant in his expectation to obtain its entire death benefit, by reason of his outlay in the payment of assessments and dues thereon of $111.98, but upon the proof in the record no injustice has been done him, as he gets back, under the decree of the lower court, the several payments he made, with interest. The charge of

appellant in his bill, that the contract he had with his father was not carried out by reason of the undue influence of the daughters of insured over him, is wholly wanting of proof.

Upon the whole case, we are of opinion that the decree appealed from is right, and, therefore, it is affirmed.

*Affirmed.*